In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-4077

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WAYNE W. KRUSE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:08-cr-00339-WCG-1—**William C. Griesbach,** *Judge.*

ARGUED APRIL 14, 2010—DECIDED MAY 25, 2010

Before POSNER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.*  Wayne W. Kruse was convicted of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and three counts of filing false income tax returns, in violation of 26 U.S.C. § 7206(1). He now challenges the sufficiency of the evidence supporting his conviction. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

Mr. Kruse owned Wayne's Caulking as a sole proprietorship. He had owned the business since 1991 and has been in the industry approximately 35 years. During times relevant to this case, Mr. Kruse employed a bookkeeper and receptionist, Jody Zepnick, and used the services of a paid tax preparer, Lonny Swaney, who owned Pullen Accounting. The evidence established that Mr. Kruse filed materially false income tax returns for the years 2002, 2003 and 2004. His returns claimed deductions for non-existent business expenses and therefore underreported his business income by $476,287 over the three years. The underreported amounts ranged from $100,000 in 2003 to $198,802 in 2002. Consequently, the amount of tax due was underreported by $168,532 over the three years. The dispute at trial focused on whether Mr. Kruse willfully had filed these false returns.

We review the basic evidence submitted to the district court who sat as the trier-of-fact. In 2005, the Government audited Mr. Kruse's returns. At Mr. Kruse's direction, Zepnick worked with IRS revenue agent Robert Ulrich during the audit. Agent Ulrich asked Zepnick to document a $105,803.72 expense from December 2003, attributable to job materials. Zepnick produced invoices totaling $5,803. Zepnick also indicated that, according to Mr. Kruse, receipts documenting the remainder of the expenses had been moved to Mr. Kruse's residence because of insufficient storage room at the shop. Agent Ulrich testified, however, that "[i]t appeared that they

had plenty of storage in their business location." Trial Tr. at 45, Apr. 13, 2009. Agent Ulrich subsequently met with Mr. Kruse. Mr. Kruse stated that he had gone through the boxes he had moved and could not find the receipts. He said that he must have totaled the invoices at the end of the year.

Mr. Kruse also had tens of thousands of dollars in unreported gambling winnings as shown in W-2G's— $12,000 in 2003 and over $100,000 in 2004. Agent Ulrich testified that, when asked why he did not report the winnings, Mr. Kruse stated that "[i]t wasn't that much, so he didn't think it mattered that much." *Id*. at 64. Although Mr. Kruse indicated that he thought he was losing money on his gambling, he did not keep records of it.

After Agent Ulrich's audit, the case was transferred to Special Agent Jeffrey Luepke. Mr. Kruse told Special Agent Luepke that no suppliers billed him at the end of the year, and there would not have been any large, end-of-year inventory purchases. When asked about the $105,000 entry from 2003, Mr. Kruse stated that he did not know where that number had originated or why there would be such a large entry at the end of the year. He said that Swaney, his tax preparer, must have made the entry. Mr. Kruse had a similar response to a $140,000 entry from 2004. Mr. Kruse also stated that he was making $300,000 to $400,000 per year from the business. When told that his tax returns only showed about $100,000 of income per year, Mr. Kruse "stated maybe he wasn't as profitable as he thought." *Id.* at 194. Mr. Kruse

again acknowledged his gambling winnings, expressed his belief that he was losing and stated that he did not keep any records.

In a second meeting with Special Agent Luepke, Mr. Kruse attempted to explain the inconsistency between what he earlier told Special Agent Luepke and what he had told Agent Ulrich. The amount of expenses documented at his home, Mr. Kruse stated, would not come close to the amounts in question. Moreover, he did not recall totaling up receipts at the end of the year. He also stated that he did not know the origin of a $175,000 entry from 2002.

Mr. Kruse also told Special Agent Luepke about his contacts with Swaney. According to Special Agent Luepke, Mr. Kruse said that the two had met "to discuss his taxes and that during that conversation they talked about how they could use the term 'balance things out' and they could move things here and move things here [sic] to reduce his tax liability." *Id.* at 206. Mr. Kruse also told Special Agent Luepke that he and Swaney recently had agreed to "cover each other's backs. And [Special Agent Luepke] asked him what that meant, and he said, [w]ell, we said we wouldn't squeal." *Id.* at 207. Mr. Kruse admitted that he knew something was going on with the tax returns, but did not know the extent of it.

The documentary evidence introduced at trial included an annotated profit-loss statement from 2004. The annotations, in the handwriting of Swaney, stated: "Added $199090.00. Saved $74459.66 in taxes." Ex. 14. Also, documents revealed that Mr. Kruse took personal draws

in each of the years in question that dwarfed his reported income. Finally, the tax returns from 2002 through 2004 reflected profit margins of only 8-11%, much lower than the 26% margin reflected in 2005 and 32% in 2006.

When Zepnick, Mr. Kruse's bookkeeper, was asked whether Swaney "was involved in preparing tax returns for Mr. Kruse's business," Zepnick answered, "I'm assuming no. I don't know for certain who did the taxes." Trial Tr. at 101, Apr. 13, 2009. When asked if she remembered what kinds of records she provided during the IRS audit, or any bumps in the road during the audit, Zepnick said no. She did not recall any questions from the auditor concerning the amount of $105,803.72. She also testified that Mr. Kruse does none of the bookkeeping work for his business, and that she never went through the tax returns with Mr. Kruse or even saw him look at them. She admitted, however, that she provided information from Pullen Accounting to Swaney's son, Michael, to be entered into the business's QuickBooks computer journals.

Mr. Kruse testified that he met Swaney for five minutes after Swaney called to introduce himself and to tell Mr. Kruse about his impending takeover of Pullen Accounting. Mr. Kruse further testified that he and Swaney never discussed the preparation of tax returns. He testified that he never reviewed his actual tax return, he "just sign[ed] it and sen[t] it back." Trial Tr. at 95, Apr. 14, 2009. He never had prepared his own tax returns. He did not recall getting the annotated 2004 profit-loss state-

ment from Swaney. He also testified that it never occurred to him that he would be violating the law by "put[ting] this over here, this over here to give me the best tax break that they can come up with." *Id.* at 107.

Mr. Kruse was convicted following a bench trial. The district court issued a written decision in which it emphasized several facts. No one other than Mr. Kruse profited from filing the false tax returns; the profit-loss statements reflecting the fictitious expenses were taken from Mr. Kruse's own business; Mr. Kruse had made contradictory statements to IRS officials and admitted to making some sort of agreement with Swaney; and Mr. Kruse had made large personal draws for himself that dwarfed his reported income. The court also noted Mr. Kruse's gambling habits, which suggested a possible motive for his conduct, as well as a willingness to cut corners on taxes.

The court noted that Mr. Kruse denied that he had entered into a conspiracy or that he willfully had overstated his expenses, but found this testimony not credible. Moreover, that lack of credibility strengthened the case against Mr. Kruse.

## II

## DISCUSSION

Mr. Kruse contends that the Government did not prove that his conduct was willful and that the Government did not prove that he conspired with Swaney. We

first shall review the legal principles that guide our inquiry.

In order to convict Mr. Kruse of filing false tax returns, the Government was required to prove, among other things, that his conduct was willful. This element requires "proof of a 'voluntary, intentional violation of a known legal duty.'" *United States v. Ellis*, 548 F.3d 539, 542 (7th Cir. 2008) (quoting *Cheek v. United States*, 498 U.S. 192, 200 (1991)). In order to convict Mr. Kruse of conspiracy, the Government had to prove (1) that the charged conspiracy existed, (2) that the defendant knowingly and willfully joined the conspiracy with intent to further the conspiracy and (3) that an overt act was committed in furtherance of the conspiracy. *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009). The intent required is intent to defraud the United States. *Id.* at 704-05.

When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the Government and reverse only if no rational trier of fact could have concluded that all elements of the offenses were proven beyond a reasonable doubt. *United States v. Khattab*, 536 F.3d 765, 769 (7th Cir. 2008). We do not weigh the evidence or assess credibility. *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010). "[A] verdict may be rational even if it relies solely on circumstantial evidence." *United States v. Warren*, 593 F.3d 540, 547 (7th Cir. 2010) (internal quotation marks and citation omitted).

The evidence at trial was sufficient to justify Mr. Kruse's conviction. Indeed, it was substantial.[1] Government witnesses testified about conflicting explanations of the tax returns given by Mr. Kruse. According to these witnesses, Mr. Kruse told Agent Ulrich that Mr. Kruse had totaled the invoices at the end of the year and those invoices would have supported the tax return, but that he could not find the receipts. Later, he told Special Agent Luepke that he had no idea where the figures on the tax return had originated. The contradictions in this testimony allowed the district court, as fact-finder, to infer that Mr. Kruse was altering his story because he knew the returns were false.

Mr. Kruse also told Special Agent Luepke that he was making $300,000 to $400,000 per year from the business—figures that greatly exceeded those on his tax returns. The district court therefore could infer that Mr. Kruse knew he should have reported additional income. Finally, Mr. Kruse took personal draws from

---

[1] In his reply brief, Mr. Kruse cites *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir. 1990), to argue that the Government may not rely on the now-discredited "slight evidence" rule to prove the defendant's participation in a conspiracy. The Government does not rely on such a standard. It acknowledges that we shall affirm if the evidence, taken in the light most favorable to the Government, is sufficient to prove all elements of the crime beyond a reasonable doubt. We note that, in *Durrive*, we said that "we will continue to . . . accept circumstantial evidence as support, even sole support, for a conviction." *Id.* at 1229.

the business, during each of the years in question, that greatly exceeded his reported income. This conduct allowed the trier to infer that Mr. Kruse knew that the business was taking in at least as much money as he took out. In addition to the foregoing evidence, which bears directly on the 2002, 2003 and 2004 falsifications, Mr. Kruse's unreported gambling winnings allowed the fact-finder, in the context of this case, to infer lack of respect for the tax laws.[2]

The evidence also allowed the district court to convict Mr. Kruse of conspiracy. Mr. Kruse submits that circumstantial evidence is insufficient to support his conspiracy conviction,[3] but this assertion is incorrect. *See United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002) ("[C]ircumstantial evidence is no less probative of guilt than direct evidence."). The circumstantial evidence of his complicity in the understatement of his income was, moreover, substantial. The district court was

---

[2] Mr. Kruse submits that "the District Court erred in giving great weight to Mr. Kruse['s] failure to report gambling los[s]es as a basis of finding him guilty of tax fraud." Appellant's Br. 6. This proposed reweighing of the evidence is beyond the scope of our review. It is enough to note that in this case, Mr. Kruse's failure to report over $100,000 of gambling winnings in 2004 rationally could justify an inference that Mr. Kruse lacked respect for the tax laws. This, in turn, helps support the inference that Mr. Kruse willfully evaded taxes.

[3] To the extent Mr. Kruse also contends that the Government did not prove an overt act, we note that the filing of false tax returns constitutes such an act.

entitled to conclude that a paid tax preparer would have little motivation to falsify a client's business expense *and* provide the client with notes about the falsification without the client's complicity. Yet, the evidence indicated that Swaney had followed just such a course in his 2004 annotated profit and loss statement. Although Mr. Kruse contends that he never saw these statements, they were taken from his business, of which he was sole owner-operator. The district court was entitled to infer that the notes were intended for him and that he saw them. Additionally, Special Agent Luepke testified about Mr. Kruse's statements admitting that he and Swaney had discussed preparation of his taxes and that he and Swaney had agreed to cover each other's backs. A fact-finder certainly was entitled to conclude that, unless Swaney and Mr. Kruse had agreed to proceed illegally, they had nothing to cover.

Mr. Kruse's other contentions are essentially requests that we reweigh the evidence. He repeatedly points us to his own testimony, as well as to that of Zepnick, and argues that he had nothing to do with preparing his taxes and had placed blind faith in Swaney. However, the district court found Mr. Kruse's testimony not credible. It is not necessary that the court's conclusion be the *only* rational finding it could have made. "[T]he trier of fact is free to choose among various reasonable constructions of the evidence." *Starks*, 309 F.3d at 1022 (internal quotation marks and citation omitted).

## Conclusion

The evidence at trial was sufficient to find Mr. Kruse guilty of the charged offenses beyond a reasonable doubt. His convictions are therefore affirmed.

AFFIRMED